IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| **INGERSOLL CUTTING TOOL CO.,**<br>Plaintiff,<br><br>vs.<br><br>**IOWA MIDLAND SUPPLY INC.,**<br>Defendant. | Case No. 06 C 00845<br><br>**Magistrate Judge**<br>**P. Michael Mahoney** |

## MEMORANDUM OPINION AND ORDER

### I. Introduction

The Final Pretrial Order for this case was entered on September 16, 2009. In the Final Pretrial Order, both parties consented to the exercise of jurisdiction by a United States magistrate judge. Judge Kapala transferred the case to this court's docket on September 17, 2009.

The only claim remaining in this case is Defendant Iowa Midland Supply, Inc.'s ("IMS") counterclaim. IMS claims that Plaintiff Ingersoll Cutting Tool Company ("ICTC") breached a contract signed in 1998. Before the court are four motions in limine filed by IMS.

### II. Background

In February 1998, IMS and ICTC signed an Authorized Distributor Agreement ("1998 Agreement"). The relevant language stated, "Effective February 1, 1998, IOWA MIDLAND SUPPLY INC. will be an authorized distributor handling INGERSOLL CUTTING TOOL products exclusively for all counties of Iowa east of and including" specified counties in Iowa and Illinois, and non-exclusively in certain Illinois counties. The 1998 Agreement also provided that the contract automatically renewed each year.

1

Either party could cancel the contract "at any time without cause upon thirty (30) days written notice to the other party." If either party terminated the 1998 Agreement, IMS agreed to return ICTC's property, and ICTC agreed to accept for credit any unused ICTC product.

In November 2001, ICTC mailed a letter to IMS stating, "[W]e have prepared a Distributor Agreement that describes the relationship between Ingersoll and your company. Please find enclosed two copies of the proposed agreement for your consideration and signature. . . . Please sign both copies of the agreement and return to Ingersoll for counter signature." The letter did not otherwise explicitly terminate the 1998 Agreement.

The 2001 distributor agreement ("2001 Agreement") attached to the letter stated, "ICTC shall appoint Distributor as its non-exclusive distributor in the State of Iowa and parts of Illinois and Minnesota ('Territory') for the sale and promotion of ICTC products . . . for a term of 2 years, commencing on November 19, 2001." IMS did not sign and return the 2001 Agreement as requested by the letter. ICTC continued providing IMS with its product, and IMS continued distributing it.

On December 23, 2005, ICTC sent a letter indicating that ICTC did not believe IMS was capable of continuing as an ICTC distributor. The letter further stated, "Please accept this letter as 'notice' that Ingersoll Cutting Tools is cancelling any and all agreements between our two companies." Thereafter, ICTC did not accept back IMS's inventory of ICTC product.

IMS's counterclaim alleges that ICTC breached the exclusivity provision of the 1998 Agreement.[1] According to IMS, ICTC sold to other distributors that ICTC knew would resell in territories in which IMS had exclusive distributor rights. IMS also claims that ICTC began

---

[1] Judge Kapala found on May 5, 2009 that the 1998 Agreement unambiguously gave IMS the exclusive right to sell ICTC products in certain territories. *Ingersoll Cutting Tool Co. v. Iowa Midland Supply, Inc.*, 06-C00845, at 4 (N.D. Ill. May 5, 2009).

assigning customers from IMS's exclusive territories to other distributors. ICTC also did not accept back IMS's inventory of ICTC product.

The parties dispute whether the 1998 Agreement was still in effect after IMS received the 2001 letter with the 2001 Agreement. ICTC first argues that the 2001 letter and 2001 Agreement constituted official notice of termination of the 1998 Agreement. Alternatively, ICTC argues that if sending the 2001 letter and 2001 Agreement to IMS did not explicitly terminate the 1998 Agreement, IMS still performed under the terms of the 2001 Agreement after receiving it. This indicates that IMS understood the 1998 Agreement to have been terminated. If the 1998 Agreement was terminated by receipt of the 2001 letter and 2001 Agreement or by performance thereafter, ICTC is not liable for breach.

Even if the 1998 Agreement was in effect, the parties dispute whether the contract forbade ICTC from selling its product to any distributor it knew might sell in IMS's exclusive territory, or from simply appointing another "authorized" distributor in that area. *See Ingersoll Cutting Tool Co. v. Iowa Midland Supply, Inc.*, 06-C00845, at 5 (N.D. Ill. May 5, 2009). Judge Kapala specifically found this aspect of the contract ambiguous. *Id*.

## III. First Motion in Limine

IMS's first motion in limine requests that the court instruct ICTC, its counsel and witnesses the following:

> not to refer to, mention, interrogate concerning or attempt to convey to the jury in any manner, either directly or indirectly, at any time during voir dire, opening statement, direct or cross examination and closing arguments, that the 1998 Authorized Distributor Agreement was not in force and effect in accordance with its terms at all times material to this suit.

(IMS's First Mot. 1.) IMS argues the 1998 Agreement language is not ambiguous and that the parol evidence rule prohibits any testimony altering or amending the written provisions of the

1998 Agreement. (*Id.* ¶¶ 2, 6.) IMS also argues in its motion that there is evidence supporting the fact that the 1998 Agreement gave IMS exclusive distributor rights in certain territories. (*Id.* ¶¶ 4, 5, 7.)

IMS's argument that the 1998 Agreement gave IMS exclusive distributor rights in certain territories is not contested. Judge Kapala found that portion of the 1998 Agreement extending exclusive distributor rights to IMS unambiguous.

The issue is whether the 1998 Agreement was terminated in November 2001 or at some point thereafter. "[T]he existence of a contract is generally a question reserved for the trier of fact." *Reese v. Forsythe Mergers Group, Inc. et al.*, 288 Ill. App. 3d 972, 979 (Ill. App. Ct. 1997). If no facts are in dispute, "the existence of a contract is a question of law which the trial court may decide." *Id.*

There are disputed facts in this case regarding whether the 1998 Agreement was in effect after November 2001, or whether it had been terminated either by receipt of the 2001 letter and 2001 Agreement or by the parties' actions thereafter. Whether the 1998 Agreement was in force and effect in accordance with its terms at all times material to this suit is an issue for the jury to decide.

IMS argues that the parol evidence rule bars testimony altering or amending the written provisions of the 1998 Agreement. The parol evidence rule "prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing." 11 *Willston on Contracts* § 33:1 (4th ed. 2009); *see J&B Steel Contractors v. C. Iber & Sons et al.*, 162 Ill. 2d 265, 268 (Ill. 1994) ([The parol evidence rule] generally precludes evidence of understandings, not reflected in writing, reached before or at the time of [a

written contract's] execution which would vary or modify its terms.") The parties do not dispute that the 1998 Agreement was a valid, fully integrated contract from 1998 to 2001. The dispute lies in whether it was terminated upon receipt of the 2001 letter and 2001 Agreement, or by performance thereafter. The parol evidence rule does not apply to evidence of termination of an agreement subsequent to reducing that agreement to writing. IMS's argument that the parol evidence rule bars testimony that the 2001 letter and 2001 Agreement terminated the 1998 Agreement, or that the parties' actions thereafter terminated the 1998 Agreement, fails.

The issue of whether the 1998 Agreement was terminated is an issue for the jury, and the parol evidence rule is inapplicable. The court denies IMS's first motion in limine.

**IV. Second Motion in Limine**

IMS's second motion in limine seeks to bar "[a]ny oral testimony by [ICTC's] witnesses to the effect or purporting to recite conversations with [IMS's] customers for Ingersoll cutting tools that such customers were dissatisfied with the products, services or prices of [IMS], or desired to purchase [ICTC] products from other distributors or Ingersoll itself." (IMS's Second Mot. 1.) IMS argues that such testimony would be inadmissible hearsay.

Testimony from a specific customer expressing dissatisfaction with IMS or a desire to purchase ICTC products from another distributor or ICTC itself would likely be relevant in this case and admissible. ICTC might be able to argue that a disgruntled client would have switched off of IMS's service regardless of a breach in contract by ICTC. This affects IMS's damages calculation. The court denies this motion as to testimony from specific customers. The court notes that general testimony about customers making statements expressing dissatisfaction with IMS's service would likely be inadmissible hearsay. Such testimony is also irrelevant to the issues in this case.

5

## V. Third Motion in Limine

IMS's third motion in limine seeks to bar ICTC from mentioning at trial "[a]ny evidence or assertion whether oral or in writing that [IMS] ratified and/or agreed to the terms of the unsigned [2001 Agreement] mailed to [IMS]." (IMS's Third Mot. 1.) IMS argues that the parol evidence rule bars evidence that IMS ratified the 2001 Agreement.

As stated in Section III, *supra*, the parties do not dispute that the 1998 Agreement was a valid, fully integrated contact and was in effect until at least November 2001. The parol evidence rule does not bar evidence of modification or termination of a contract subsequent to reducing it to writing. Thus, evidence that the 1998 Agreement was terminated and that IMS's actions ratified the 2001 Agreement cannot be barred by the parol evidence rule.

That portion of IMS's motion seeking to bar evidence that IMS "agreed to the terms" of the 2001 agreement is unclear. Evidence that IMS explicitly agreed to the 2001 Agreement is highly relevant, and perhaps dispositive, in this case. The court denies IMS's third motion in limine.

## VI. Fourth Motion in Limine

IMS's fourth motion in limine seeks to exclude evidence that IMS "waived its rights to rely on the 'exclusivity' provision contained in the [1998 Agreement]." (IMS's Fourth Mot. 1.) ICTC indicates that, even if the 1998 Agreement was in effect during the time period that it allegedly breached the exclusivity provision, IMS knew of the breach and voluntarily waived it.

Under Rule 8, a party must affirmatively state the defense of waiver when responding to the pleading. *Fed. R. Civ. P.* 8(c)(1). Failing to raise an affirmative defense in a responsive pleading waives the affirmative defense. *E.g.*, *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000).

6

ICTC filed its answer to IMS's counterclaim on April 24, 2006. (Crt. Doc. 24.) That answer does not include the affirmative defense of waiver. Under Rule 8, ICTC has waived the affirmative defense of waiver. The court grants IMS's fourth motion in limine and orders that ICTC cannot introduce evidence at trial solely for the purpose of proving that IMS waived the exclusivity provision of the 1998 Agreement.

**VII. Conclusion**

The court denies IMS's first, second, and third motions in limine. The court grants IMS's fourth motion in limine and orders that ICTC cannot introduce evidence at trial solely for the purpose of proving that IMS waived the exclusivity provision of the 1998 Agreement.

ENTER:

_____
P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: January 14, 2010